## (January 5, 1984)

■ The People of the State of New York, Respondent, v Carlos Roldan, Appellant. — Judgment, Supreme Court (Dickens, J.), rendered April 7, 1981, convicting defendant, after a jury trial, of kidnapping in the second degree, unlawful imprisonment in the first degree, and criminal possession in the fourth degree, and sentencing him to concurrent terms of from 6 to 12 years on the kidnapping count and from 2 to 4 years on the unlawful imprisonment charge and an unconditional charge on the weapons count. This appeal was held in abeyance and the matter was remanded for a hearing before the trial court so that the transcript could be settled (96 AD2d 476). The evidence presented at the hearing supports the trial court's conclusion that its charge, as actually given to the jury, did not contain the errors found in the stenographic minutes but was a correct presentation of the law on those points. Since we find no merit to the other issues raised by defendant, we affirm his judgment of conviction. Concur — Murphy, P. J., Sandler, Sullivan and Ross, JJ.

Asch, J., dissents in a memorandum as follows: Defendant-appellant was convicted, after a jury trial, of kidnapping in the second degree, unlawful imprisonment in the first degree, and criminal possession of a weapon in the fourth degree. He was sentenced to concurrent terms of from 6 to 12 years on the kidnapping count and from 2 to 4 years on the unlawful imprisonment charge, and received an unconditional discharge on the weapons count. His conviction was based upon an incident during which he entered a residential building armed with a knife and held three individuals hostage. The police shot him after he lunged at one of the victims with his knife. Prior to trial, a robbery count was dismissed on motion of the People. The facts as presented by the People are not in substantial dispute. The account of what transpired and the conduct of the appellant does not seem to square with what any *rational* criminal, intending to profit from his acts, would do. Certainly, the events must raise serious questions as to appellant's mental condition at the time of the incident. On July 7, 1979, at approximately 4:45 P.M., appellant entered the lobby of a residential building in Manhattan and told the doorman that he wanted to see his mother. The doorman asked him where his mother lived (she did not live in that building). Appellant then pulled a knife out of his belt and moved toward the doorman, who then yelled for someone to call the police. The doorman repeated this to a man he saw entering the lobby. Appellant then looked around and left the building. The doorman locked the door to the lobby and immediately went upstairs and reported the incident to the superintendent. The superintendent's wife called the police. At that time, three persons, Nancy Adelson, Leslie Kogod and Gary Godbersen, came into the building. Adelson was visiting the other two, who lived there. The defendant followed them into the lobby. He approached Ms. Adelson and suddenly tried to snatch her pocketbook. She held on to it until she saw that he was holding a knife with a six-inch blade, when she released it. Godbersen and Kogod asked defendant to return Adelson's pocketbook. He then threatened Godbersen with a knife and told Adelson, "I don't want your purse. I will give it back to you when the police come." Kogod said, "What do you want if you don't want the money? We'll give you money. What do you want?" The defendant told them that they would find out what he wanted when the police arrived. He then told them to sit in three chairs which were in the lobby. Defendant stood near the elevator and held the purse in one hand and the knife in the other. He told the three persons that they were going to wait for the police to arrive. Godbersen asked him what he was going to do with the knife. He pointed it at Godbersen and

told him to be quiet and said that he "knew how to use this thing" and pointed the knife at him again. For the next 10 to 15 minutes the defendant stood still in the lobby, holding the knife and the pocketbook, while the other three sat in their chairs. The first two police officers, Kevin Perno and Richard Garrone, arrived outside the building. The defendant went directly behind the chair in which Nancy Adelson sat and placed the knife against her throat. Godbersen started to get up and asked the defendant if he could unlock the door for the police to enter. The defendant told him to sit down. In a couple of minutes, the elevator door opened and a man exited and walked through the lobby, opening the front door, and walked outside. The two officers immediately entered. Officer Perno asked the defendant if he would speak to them. The defendant replied that he would but said, "No guns, no guns, or I'll kill her." The officers repeatedly told him to take it easy and assured him that they were not going to do anything. The defendant told them that he hated cops because he had gone to a precinct to ask for help and they had thrown him out. They assured him that was another precinct and they never would have thrown him out. The defendant started shaking and the officers encouraged him to calm down. They asked him if Godbersen and Kogod could leave. He said no, and he threatened to kill Nancy Adelson if the other two moved. They asked him what he wanted. He said he wanted a plane to take him to Puerto Rico to see his mother. Officer Perno told him that he was going to work on it and left the lobby and went outside to speak to some other officers. Sergeant Sidney Patrick entered the lobby and slowly approached the defendant, who was still holding his knife to Adelson's throat. He threatened to kill her if the sergeant came any closer. The sergeant removed his gun belt and handed it to another police officer, and told the defendant, "Look, I've taken off my gun. I am not going to hurt you. I just want to talk to you. Would you please just put the knife down." The defendant again warned the sergeant that if he moved any closer, he would "kill the girl." The defendant looked toward a stairway which was in the rear of the lobby. He placed his knife closer to Ms. Adelson's throat and pulled her from her chair by the wrist. She suddenly broke away from him and ran past Sergeant Patrick toward the rear stairway. The defendant started to move in that direction, but then quickly moved to where Gary Godbersen was sitting. He grabbed Godbersen's left shoulder and swung the knife in the direction of his neck. Meanwhile, two emergency service officers had entered the lobby. When they saw the defendant lunge at Godbersen, one of them fired three shots, striking the defendant, who fell to the floor. The defendant was unconscious and was taken to the hospital. Dr. Robert Goldstein, a psychiatrist, was the defendant's sole witness. He testified that as a result of a mental disease or defect, the defendant lacked substantial capacity to appreciate the nature and consequences of his criminal acts at the time in question. This was based on his diagnosis of acute psychotic reaction, also known as brief reactive psychosis. Dr. Goldstein's conclusions were based upon a review of the defendant's medical history, records of the crime, and a two-hour interview he had with the defendant. The defendant told the doctor, *inter alia,* that he recalled nothing of the incident, which had occurred shortly after he had had a fight with some men in the street. He told the doctor he had a history of past blackouts occurring after upsetting incidents. Dr. Morris Herman testified on behalf of the People. He also reviewed defendant's medical records and records of the crime, as well as Dr. Goldstein's report, and also conducted an interview with the appellant. Dr. Herman rejected Dr. Goldstein's opinion that the defendant had suffered from an acute psychotic reaction. Dr. Herman concluded that the defendant suffered from no mental disease and had substantial capacity to appreciate what he was doing and that his actions were wrongful. It was his opinion that the defendant's amnesia about certain particulars of the incident

could have been voluntary or could have been attributed to an acute loss of blood and shock as a result of being shot. It was his opinion that defendant's conduct was socially aberrant, but not the product of a mental disease. Appellant, through counsel, argues that all of the elements of kidnapping in the second degree were not proven beyond a reasonable doubt since his stated purpose was to get the attention of the police and cause the police to arrange for him to see his mother, who was in Puerto Rico. He states that "such conduct does not rise to the level of seriousness as would constitute a B felony." He claims there was no "abduction" in this case and that the detention was of too brief a duration to constitute the crime of kidnapping, and the victim was never removed from the lobby of the building where she was seized. Neither of these arguments is persuasive. However, appellant raises a serious doubt as to the manner in which the crucial issue of his sanity was submitted to the jury. This appeal was held in abeyance and the matter remanded to the trial court so that the transcript could be settled. I am still unconvinced that the charge did not contain the errors found in the stenographic minutes. Appellant claims that the court's charge on the insanity defense was erroneous in that it shifted the burden of proof on the defense to the defendant. The court commenced its charge regarding this defense by indicating that the People had the burden of disproving such defense beyond a reasonable doubt. The court very briefly reviewed the testimony of both experts and then charged as follows: "If you accept the reasoning and opinion of Dr. Goldstein and you can conclude that due to the defendant's condition he did not know the nature and consequences of his act or that his conduct was wrong then you must find the defendant not responsible by reason of such condition. If on the other hand you accept the opinion of Dr. Herman that the defendant didn't know the nature and consequences of his act or that such acts were wrong beyond a reasonable doubt you would then move to consider the alleged crimes of kidnapping, possession of a weapon and unlawful imprisonment in the first degree." This was error. At that point the court should have made clear that, taking into consideration all of the testimony, including both experts, the People still had to disprove the insanity defense beyond a reasonable doubt. This is so even though a scant page and one half earlier in the charge the court had advised the jury as to the correct burden of proof. In addition, the court's charge on the consequences of a verdict of not responsible by reason of mental disease or defect may have prejudiced the jury. CPL 300.10 (subd 3) sets forth an instruction which the court must give the jury, without elaboration, where the defendant has raised the insanity defense. The court did give this charge to the jury. However, as it appears in the record, there is one glaring error: "A juror during the deliberations must never consider or speculate concerning matters relating to the consequences of its verdict. However because of the lack of common knowledge regarding the conditions of a verdict of not responsible by reason of mental disease or defect I charge you that if this verdict is rendered by you there will be *no* hearings as to the defendant's present mental condition and the appropriate involuntary commitment proceedings." (Emphasis added.) As can be seen, the word "no" was tantamount to the court instructing the jury that if it returned a verdict of not responsible by reason of mental disease or defect, the appellant would have no further hearings or commitment proceedings to undergo but would be immediately released. The People point out that neither attorney raised the question of this error. In addition, the People urge that it is clear that it resulted from error by the stenographer either in recording what the Judge said or in typing, since the Judge seemed to be quoting from the statute and "it is highly improbable that he would read verbatim from the statute but nevertheless give the totally opposite meaning to it." It is not for us to speculate as to whether or not the error was stenographic. It may well be

that experienced and jaded lawyers did not hear the interposition of the word "no" into an otherwise verbatim statement of the statutory provision. Where there has been error of this magnitude in the charge, speculation by this court as to whether the record accurately reflects the charge is inappropriate. If the Judge in charging the jury mistakenly instructed them that there would be no further hearings as to the defendant's mental condition if he were acquitted, there is a significant probability that they may well have been motivated to find him guilty. There is reason to believe that a jury's concern over whether or not a "dangerous" defendant, if acquitted, will go "free," may influence them to bring in a guilty verdict. Apparently, Judge Bazelon was of this opinion when he wrote in his dissent in *Tatum v United States* (249 F2d 129, 133): "[A] jury, influenced by the specter of violent lunatics turned loose in the community, may 'convict, despite strong evidence of insanity at the time of the crime.'" As Professor Brooks has asked, "If so, should not the jury be told the true facts [i.e., that the defendant will not be freed automatically upon a verdict of not guilty] to correct a prejudicial misapprehension?" (Brooks, Law, Psychiatry and the Mental Health System; material in brackets added.) If the proof of defendant's guilt without reference to the error is considered overwhelming, any evaluation of an error as to its potential for prejudice to the defendant must conclude that there is a significant probability rather than only a rational possibility that the jury would have acquitted the defendant had it not been for the error which had occurred (*People v Crimmins,* 36 NY2d 230, 241-242). The erroneous charge in this case was diametrically opposite from the correct statement of law, and there is a significant probability that it resulted in the appellant's conviction by the jury. I am not convinced, however, that the proof presented *was* sufficient as to defendant's legal sanity at the time of the incident. Thus, both errors in the charge should be deemed to be prejudicial and require a reversal. Although no timely objection was made to the charge, this court can and should exercise its discretion to review in the interest of justice (CPL 470.15, subd 6, par [a]; see *People v Thomas,* 50 NY2d 467, 473). It is quite clear that the police themselves, from the inception of the incident, had doubts about the mental condition of the appellant ("the perp went berserk"). I would not dissent if what was involved were no more than the vindication of technical legal rights. But there appears to be a serious question, to me, as to whether the appellant should have been convicted and sentenced as a criminal, with its penal sanctions. It would be little more than the application of the archaic law of deodands (see Holmes, The Common Law, pp 23-24) to sentence the defendant-appellant to a jail if his mental state required instead that he be treated as lacking legal capacity with consequent hospitalization in a mental institution. Accordingly, I would reverse the judgment appealed from and remand for a new trial.